# STATE v. PACKARD.

No. 7773.   Decided November 17, 1952.   (250 P. 2d 561.)

See 36 C. J. S., Master and Servant, sec. 14. Reasonableness of classification as test of constitutionality of statute. 50 Am. Jur., Statutes, sec. 52.

*Clarence M. Beck, Brigham E. Roberts, J. Elmer Banks,* Salt Lake City, *Clinton D. Vernon,* Atty. Gen., for appellant.

*Louis H. Callister,* Salt Lake City, for respondent.

CROCKETT, Justice.

Russell Packard was convicted of an offense described as: "Failure to register with the Industrial Commission before commencing employment", he having started to work for the Utah Wholesale Grocers Company at a time when its employees were out on strike. The conviction was appealed to the district court, which dismissed the proceeding upon the ground that the statutes requiring such registration are unconstitutional. That ruling is before us for review.

The sections under attack are 49-1-29 to 32, U. C. A. 1943; the one with which we are chiefly concerned being Sec. 29, which provides as follows:

"It is the duty of every person before *commencing employment* with any person, firm or corporation whose employees are out on labor strike *called by a national recognized union* to register with the industrial commission of Utah." (Emphasis added.)

Other sections provide that the registrant shall give his name, residence, and the time, place, nature of the work and for whom it is to be performed, which record must be open for public inspection.

Defendant contends, inter alia, that the statute above quoted is invalid because:

1. It is vague and uncertain; and

2. It is unreasonably discriminatory.

The first reason advanced as to vagueness is the suggestion that the words "commencing employment" may be interpreted to apply not only to new employees but also to persons previously employed but who merely went back to work or continued in employment, and thus, in a sense, "commencing" to work after a strike has been called. This seems to be a strained attempt to import vagueness into a context which is clear and understandable. The word commence means "begin"—"perform the first act of"—"take the first step"—or "to start", 7 Words and Phrases, p. 726. In the context of the statute the term "commencing" seems neither vague nor ambiguous. It has a fixed meaning which is commonly understood. It would apply only to persons commencing employment *anew*, that is, *for the first time,* while the strike is in progress and would not apply to former employees who merely returned to work and thus *continued* in employment.

As to the phrase "called by a national recognized union", the problem with respect to vagueness is considerably different. Without the words just quoted, this law would have required *all* persons to register before commencing employment at *any plant* whose employees were out on any strike. In this form, it passed the Senate but was amended from the floor of the House by the insertion of the quoted phrase, which amendment was later concurred in by the Senate. Restricting the application of the statute to strikes "called by a national recognized union" which would exclude strikes by "other unions" effected a substantially different meaning than the original one.

As so amended, this statute is unique in this state, insofar as we have been able to find, and therefore there appears to be no judicial precedent to assist in an analysis thereof except that of our own district courts. It was first enacted in 1937, S. L. U. 1937, Ch. 53. In connection with a prosecution brought under it, *State* v. *Tanner,* District Court

Crim. Case #10,694, Honorable Herbert M. Schiller, then district judge, in 1938 declared the statute unconstitutional. In a written decision, which was included as a part of the record in this case, he made an able and somewhat comprehensive analysis of the statute, for which we are indebted to him. From aught that appears, this statute was thereafter regarded as unconstitutional and void, no further use being made of it until the initiation of this prosecution in March of 1951. Upon submission of the question again to the district court, Honorable Joseph G. Jeppson, in accordance with the prior action of judge Schiller, also ruled it unconstitutional. It is not suggested that the aforementioned rulings are binding upon this court, but reference is made to the correctness and uniformity of their decisions upon the statute in question, and with which we are in accord.

It is recognized that statutes should not be declared unconstitutional if there is any reasonable basis upon which they may be sustained as falling within the constitutional framework. *Newcomb* v. *Ogden City, etc.*, 121 Utah 503, 243 P. 2d 941; *State Board of Education* v. ██ *Commission of Finance*, 122 Utah 164, 247 P. 2d 435, and that a statute will not be held void for uncertainty if any sort of sensible, practical effect may be given it. *Norville* v. *State Tax Comm.*, 98 Utah 170, 97 P. 2d 937, 126 A. L. R. 1318; *State* v. *Packer Corp.*, 77 Utah 500, 297 P. 1013; see also *State* v. *Packer Corp.*, 78 Utah 177, 2 P. 2d 114, *Packer Corp.* v. *State*, 285 U. S. 105, 52 S. Ct. 273, 76 L. Ed. 643.

The statute under consideration would curtail one of the basic freedoms vouched safe by our state constitution. The founders of our commonwealth, realizing that in our complex society, it is impossible for each man to establish and operate his own enterprise for earning a livelihood, so that

the majority must of necessity work for others, provided in Article XII, Sec. 19 of the Utah State Constitution:

"Every person in this State shall be free to obtain employment whenever possible, * * *"

and declared any malicious interference therewith to be prohibited. This freedom to work complements and makes more meaningful the other rights guaranteed as part of our constitutional liberties. Admittedly, the right is not absolute. It may be limited by reasonable regulations correlated with the general welfare. For example, the qualifications prerequisite to engaging in the professions, trades and many occupations; the regulation of hours, wages, safety and other controls necessary for the common good. But even for such proper purpose, great caution must be observed in permitting encroachments upon basic rights, assured by the constitution, and such restriction can be effected only in accordance with constitutional prerogatives and where clearly expressed standards are set up.

This court a number of times has applied the principle which is well stated in the case of *Connally* v. *General Construction Co.*, 269 U. S. 385, 46 S. Ct. 126, 127, 70 L. Ed. 322,

"* * * a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. * * *"

In the *City of Price* v. *Jaynes*, 113 Utah 89, 191 P. 2d 606, 607, a city ordinance which provided that

"the right * * * to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated"

was held so vague and uncertain that it did not define a crime; *State* v. *Musser*, 118 Utah 537, 223 P. 2d 193, 194; *Musser* v. *State*, 333 U. S. 95, 68 S. Ct. 397, 92 L. Ed. 562,

that the phrase "to commit any act injurious  *  *  *  to public morals" U. C. A. 1943, 103-11-1(5), was unconstitutional for vagueness.

Appropriate to our problem is the case of *In re Peppers,* 189 Cal. 682, 209 P. 896, 897, wherein an act providing that

"oranges shall be considered unfit for shipment when frosted to the extent of endangering the reputation of the citrus industry"

St. 1921, p. 1234, § 10, was struck down as uncertain because it provided no standard upon which the shipper could determine whether he was violating the act. Analogous also is the case of *Cook* v. *State,* 26 Ind. App. 278, 59 N. E. 489, in which a statute, Rev. St. 1897, § 6600, prohibiting the hauling over wet or thawing roads of a load of more than 2,000 pounds on a "narrow-tired wagon" or more than 2,500 pounds on a "broad-tired wagon" was held void for uncertainty because there was no standard by which one could determine what the statute meant by the comparative terms "broad" and "narrow".

The limitations of language are such that neither absolute exactitude of expression nor complete precision of meaning are to be expected, and such standard cannot be required. On the other hand there is no disagreement among the courts that where a rule is set up, the violation of which subjects one to criminal punishment, the restrictions upon conduct should be described with sufficient certainty, so that persons of ordinary intelligence, desiring to obey the law, may know how to govern themselves in conformity with it, and that no one should be compelled at the peril of life, liberty or property, to speculate as to the meaning of penal statutes. *Price* v. *Jaynes,* supra; *State* v. *Musser,* supra; *U. S.* v. *L. Cohen Grocery Co.,* 255 U. S. 81, 41 S. Ct. 298, 65 L. Ed. 516; *Stromberg* v. *People of State of Cal.,* 283 U. S. 359, 51 S. Ct. 532, 75 L. Ed. 1117; *Connally* v. *General Construction Co.,* supra; *Lanzetta* v. *New Jersey,* 306 U. S. 451, 59 S.

Ct. 618, 83 L. Ed. 888; see Law Ed. annotations in connection with latter two cases.

Concerning the question of uncertainty or vagueness of statutes, the authorities seem to be in accord that the test a statute must meet to be valid is: It must be sufficiently definite (a) to inform persons of ordinary intelligence, who would be law abiding, what their conduct ■ must be to conform to its requirements; (b) to advise a defendant accused of violating it just what constitutes the offense with which he is charged, and (c) to be susceptible of uniform interpretation and application by those charged with responsibility of applying and enforcing it.

How does the statute in question fit these requirements? If one desired to go to work at a plant where a strike was in progress, how would he determine whether he must first register with the Industrial Commission? Because of the amendment which restricted the application of this law to strikes called by "a nationally recognized union", it would be necessary to ascertain what character of union is meant by that phrase. Observe that the statute does not say, "called by a *national union*" which is the phrase that counsel attempts to define and interpret for us, but the wording is, "a national *recognized* union". From the context of the statute and the legislative record, it appears that the word "national" should have been "national*ly*"; that is, it should have been an adverb modifying the verb "recognized" rather than an adjective modifying the noun "union". However, whichever the way it was meant, uncertainties would exist which make the statute void.

"National *recognition*" implies something quite different than "national *existence*"; that is, in one sense, a union could exist as a national union, but still leave unanswered questions as to whether it is a national *recognized* union. Does the statute imply that there has to be recognition of the union by some duly constituted national authority or

organization? It would be necessary to ask, recognized by whom? the public generally? by labor organizations? by industrial leaders? by the N. L. R. B.? If the average citizen (whoever he may be) has heard of the union, does that give it national recognition? There is, of course, no legal standard referred to in the statute or known to us, by which it may be determined what a "nationally recognized" union is.

The State offers no specific answer to such questions. Their argument that the statute is sufficiently definite to be understandable, as stated in their brief is:

"The phrase 'called by a national*ly* [sic] recognized union,' therefore merely limits the act's application to those situations where the strike is called by the larger unions—those which organize in whole industries on a nationwide scale, or extending over geographical areas crossing state lines."

Let us examine these suggested tests for determining what such a union is:

"The larger unions": larger than what? It would be as difficult to tell how big a union would have to be in order to qualify as a "larger union" as it would be to tell the width of a "narrow tired wagon" or or how much frost in an orange would "endanger the reputation of the citrus industry". Certainly this comparative term furnishes no definite standard for determining which unions are referred to by the statute.

"Which organize in whole industries": Obviously, unions cannot organize whole industries at one stroke; does the statute mean that no protection would be afforded during the process of development and organization, but the protective cloak of the statute would enshroud it only after the whole industry were organized? Again, would it be contended that a well known union would not be classified as a "nationally recognized union" if it were shown that sub-

stantial portions of a given industry were not yet organized by it?

"On a nation wide scale or extending over geographical areas crossing state lines": The same questions recur. Does that mean every state in the union, or any state having any part of the industry in respect to which the union operates? How many states would the union have to be in, 2, 7 or 48? Exploration of this thought leads to the conclusion that it would be difficult, if not impossible, to tell on the basis of geographical distribution, whether a union would be classified as "a nationally recognized union", whatever that phrase may be thought to mean.

Other questions present themselves: Would a large and powerful independent plant union, wholly local in character and not affiliated with any other union, be within the classification? If a strike were in progress called by such a union, would registration be required? Suppose a strike were called by a very small local unit of a large and widely distributed union such as, for example, the United Mine Workers, but the parent union gave no authority or sanction to the strike called by the local unit. Would such a strike be *called by* a nationally recognized union" and would a new worker have to register?

It is not to be doubted that the Teamsters Union, involved in the strike in the instant case, is a union which would meet any reasonable test for being classified as a "nationally recognized union" if such a thing there be. Defendant also concedes this. However, the test of constitutionality of the statute is not whether one or more unions can conveniently be identified as being within the statute, but whether the statute is sufficiently clear so that persons of ordinary intelligence could tell which unions the statute would apply to and which it would not, and thus be able to know how to comply with the law. Here the uncertainties are such that one might well be perplexed to know whether he had to register before going to work. Therefore, the statute is

so indefinite and uncertain that it is unconstitutional, as ruled by the lower court.

Even if it should be assumed that the phrase we have just discussed adequately specifies just which unions would be covered and which excluded, so the statute would be sufficiently definite in meaning to inform persons subject to it when they must register, it would be vulnerable to defendant's other attack: that is, in affording protection to some unions and businesses and excluding others, it would be unreasonably discriminatory.

Statutes may deal with different classes differently, if all within the same class are treated uniformly, and so long as there is some reasonable basis for differentiation between classes related to the purpose of the statute. *State* v. *Mason*, 94 Utah 501, 78 P. 2d 920, 117 A. L. R. 330; *State* v. *J. B. & R. E. Walker, Inc.*, 100 Utah 523, 116 P. 2d 766. Conversely, a statute is unconstitutional as being unreasonably discriminatory if it differentiates between such classes without any reasonable basis bearing on the purpose sought to be accomplished by the statute. *Gronlund* v. *Salt Lake City*, 113 Utah 284, 194 P. 464; *Slater* v. *Salt Lake City*, 115 Utah 476, 206 P. 2d 153, 9 A. L. R. 2d 712.

The question arises: Would there by any valid reason for making a distinction between "nationally recognized unions" and "other unions" in relation to the purposes sought to be accomplished by this statute?

The purpose of the legislation was apparently to promote industrial peace and eliminate possible violence or strife in connection with strikes; that is, requiring registration by persons going to work during strikes would likely discourage them from taking such employment, or at least, by making them more readily identifiable to law enforcement authorities, would make them be less apt to engage in any violence or other unlawful activities in connection with such labor disputes; particularly, it is said the statute

was purposed to counteract and prevent the use of "goon squads" or "strike breakers". This practice has been indulged in in some parts of the country by the bringing in of transient or irresponsible persons for the express purpose of breaking strikes and has resulted in violence. Such difficulties would occur in connection with the activities of the smaller unions and smaller plants or businesses in the same way and with the same bad consequences as in the larger unions and larger plants. In fact if there be any difference, the smaller unions and smaller businesses would probably be more vulnerable to the ills attendant upon violence or strife and would therefore be more in need of protection than the larger and presumably more powerful ones. It is well known that unions are at times highly competitive among themselves; to confer an advantage upon one union or group of unions, depriving others of it, would be an unfair discrimination for which no reason consistent with the purposes of the statute could be assigned. In fact, to deprive either the smaller unions or smaller businesses of any protection afforded their competitors would be unjustly discriminatory. As originally introduced, the act proposed to give them equal protection; as amended, it purports to cover some and exclude others. There appears to be no valid reason for such differentiation which is in any way correlated to the purposes of the statute, nor in fact any reason why they are not all entitled to whatever benefits might have been conferred by this law.

Accordingly, we hold that it is unconstitutional and void.

Judgment affirmed.

McDONOUGH, J., concurs.

WADE, Justice.

I concur with the prevailing opinion that this statute is unconstitutional because it is unreasonably discrimina-

tory. Since that disposes of the case, it is not necessary to decide whether a conviction under this statute lacks due process of law because the statute is too uncertain. I therefore express no opinion on that question.

HENRIOD, Justice.

I concur for the reason that the language of the act is so loose as to make it impossible for union agents, public prosecutors, those taking employment at a struck plant, or anyone else, definitely to determine who might or might not be violator or victim in instances where the question of strikebreaking arises. Upon careful analysis, the statute conceivably could be an instrument of embarrassment and oppression to union member and strikebreaker alike, if either made an erroneous interpretation of the wording of the statute.

WOLFE, Chief Justice.

I dissent.

Addressing myself first to the contention that the statute in question is so vague and indefinite as to render it unconstitutional, I think the statute is definite enough to enable a person about to commence work during a strike to determine whether he should register. Approaching the problem practically, it is clear that a "national recognized union" means nothing more nor less than a "national known union". The troublesome word evidently is "recognized". I think this word was used by the drafters as synonomous with "known". Strictly speaking, "recognized" contains the element of acknowledgment; yet, without doing homage to the niceties of its meaning, it is used synonymously with "known". A nationally known product—a nationally recognized product. At least we can, as has been done countless times, so interpret the law to eliminate the problem of semantics. It is not necessary to hold the word under the microscope and ask "recognized by whom? the public gen-

erally? by labor organization? by industrial leaders? by the N. L. R. B.? by the average citizen? We on this bench have a knowledge of what are national unions. We know that they are the large unions (to get away from the comparative degree which seems to give Mr. Justice Crockett considerable trouble) which are organized over an industry without regard to state lines, and in many cases in Canada without regard to that border. I do not see that anything is gained by analyzing the language of the Attorney General as if that language used in argument to convey the practical and reasonable meaning were itself under surveillance as is the statute. Certainly national unions to be such do not need to be organized or operating in every state of the union. It seems to me we are borrowing difficulties born of a desire to hold the statute unconstitutional rather than to hold it constitutional. This word "recognized" does not introduce the punzzlement which comes from words like "narrow" or "wide", "hot" or "cold", "short" or "tall", etc. nor the great uncertainty arising out of a complex and vague description of "oranges frosted to the extent of endangering the reputation of the citrus industry". There is a slight distinction between "national known" and "nationally known" in that one is an adjective limiting the noun "union" and the other an adverbial adjective modifying the adjective "known", but I do not think the distinction of sufficient import to merit further attention because brushing aside niceties they come to the same thing. The very illustrations given by Mr. Justice Crockett give an excellent clue to where the line between legally differentiable and non-differentiable distinctions come. Likewise, his illustrations of vagueness beyond the allowable line give a clue to what is and is not so vague as to not permit of reasonable application of the statute in question.

Turning now to a consideration of the contention that the statute is unreasonably discriminatory, it must be kept in mind that neither the constitutionality nor the interpretation of a statute can be determined in a vacuum. The de-

termination must be made in a proper frame of reference. In statutes dealing with management-labor relations the frame of reference usually must include an examination of the socio-economic problems and conditions extant at the time of the passage of the act, and the industrial mores of the time. Clearly, such approach gives us an understanding of the evils toward whcih the statute in question was directed and the evils which were deemed in need of remedying.

On February 8, 1937, evidently before the Act in question became effective (effective date of Act February 16, 1937) the Senate of the United States was in the course of making its investigation pursuant to S. Res. 266, 74 Congress through the LaFollette Sub-Committee of the Committee of Education and Labor as to the resistance encountered by labor in unionizing an industry and the means employed in breaking up unions and rendering abortive their efforts to organize and grow. The Sub-Committee's interim report was replete with specific instances of strike breaking and intimidation of laboring men which followed the era in which the Norris-LaGuardia Act, 29 U. S. C. A. § 101 et seq., prevented resort to court injunction on the side of management in a contest between owners and workers for advancement of the interests of the latter. See S. Report 76, 75 Congress, 1st Sess. Vol. 81, Part I Congressional Record, pp. 952 to 956. Those were still part of or close on the heels of the era when labor was compelled to fight for every step of its advancement; when strikes were outlawed by injunction on the theory, as Justice Oliver Wendell Holmes said, that the right to carry on business was viewed by the courts as property like real estate. The struggle went on in several fields—on the industrial front in shop and factory; in the legislatures; and in the courts. And that this industrial-labor struggle was over a long period of time bitter and implacable, no one can doubt who has a reading acquaintanceship with Haymarket riots in Chicago, the Pullman strike where men on a free labor market

were, through want, compelled to accept wages of a dollar a day or less. Resort was had to the legislatures to restrict the preponderating advantage possessed by ownership under the laissez-faire system in this struggle, thus hoping to increase the potential for the success of collective bargaining under that system.

As a court we are not concerned with the wisdom of this legislation; we are not to determine whether the pendulum has swung too far; whether labor has now become the preponderating party. These are questions belonging to the political domain.

With the frame of reference as above supplied, it seems very probable that the evil aimed at was to prevent the importation into this state of the type of men who were not ordinary industrial workers, but professional strike breakers, ofttimes recruited from thugs, "goons", gangster and vigilante types of men, and even ex-convicts. The legislature thought apparently that the practice of importing into a community such types of men to prey upon it could be discouraged by the requirement to register. Perhaps the day has passed when this protection for the community and for the right to strike, now unquestioned, is needed; but at the time the statute in question was enacted, 15 years ago, the legislature apparently deemed the practice which the law was aimed at called for the implementation of that law by the concrete means of registration with the Industrial Commission. If the law is no longer needed, it should be repealed. But it should not be erased from the books on the theory that it is unconstitutional if it can in reason be held constitutional.

The Legislature did not set up an arbitrary or unreasonable classification when it required persons

"commencing employment with any person, firm or corporation whose employees are out on labor strike called by a national recognized union to register with the industrial commission of Utah",

but imposed no such requirement when a strike is called by unions which are not "national recognized". Presumably the evil at which the legislation was aimed did not occur when strikes were called by smaller or local unions which are ofttimes company unions, or the evil existed in a lesser degree. To argue, as does the main opinion, that

"smaller unions and smaller businesses would probably be more vulnerable to the ills attendant upon violence or strike and would therefore be more in need of protection than the larger and presumably more powerful ones"

is beside the point. It is for the Legislature and not for the courts to determine how far the beneficent protection of legislation should extend. In 12 Am. Jur. § 484 it is stated:

"There is no constitutional requirement that regulation must reach every class to which it might be applied—that the legislature must regulate all or none. It is not unconstitutional merely because it is not all-embracing, and does not include all the evils within its reach.

"In the field of constitutional law relating to the extent to which corrective legislation may pick out the objects to which it is addressed, the rule is fundamental that the state may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses. * * * In dealing with practical exigencies, the legislature may be guided by experience. If the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied."

Illustrative of the above principles is the case of *Radice* v. *New York,* 264 U. S. 292, 44 S. Ct. 325, 327, 68 L. Ed. 690, in which the court considered a statute of New York prohibiting the employment of women in restaurants in cities of the first and second class between the hours of 10 o'clock at night and 6 o'clock in the morning. It was there contended that the statute contravened the equal protection clause of the Fourteenth Amendment to the Constitution of the United States by (1) discriminating between cities of the first and second class and other cities

and communities and (2) in excluding from its operation women employed in restaurants as singers and performers, attendants in ladies' cloak rooms and parlors, as well as those employed in dining rooms and kitchens of hotels and in lunch rooms or restaurants conducted by employers solely for the benefit of their employees. Said the court in holding the classification constitutional:

"The limitation of the legislative prohibition to cities of the first and second class does not bring about an unreasonable and arbitrary classification. *Packard* v. *Banton*, 264 U. S. 140, 44 S. Ct. 257, 68 L. Ed. [596], decided February 18, 1924; *Hayes* v. *Missouri*, 120 U. S. 68, 7 S. Ct. 350, 30 L. Ed 578. Nor is there substance in the contention that the exclusion of restaurant employees of a special kind, and of hotels and employees' lunchrooms, renders the statute obnoxious to the Constitution. The statute does not present a case where some persons of a class are selected for special restraint, from which others of the same class are left free (*Connolly* v. *Unior Sewer Pipe Co.*, 184 U. S. 540, 564, 22 S. Ct. 431, 46 L. Ed. 679); but a case where all in the same class of work are included in the restraint."

The court cited numerous examples of classifications which it has upheld in prior decisions, and quoted with approval the following language from *Miller* v. *Wilson*, 236 U. S. 373, 35 S. Ct. 342, 344, 59 L. Ed. 628:

"It [the Legislature] is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest. As has been said, it may 'proceed cautiously, step by step,' and 'if an evil is specially experienced in a particular branch of business' it is not necessary that the prohibition 'should be couched in all-embracing terms.' *Carroll* v. *Greenwich Insurance Co.*, 199 U. S. 401, 411, 26 S. Ct. 66, 50 L. Ed. 246, 250. If the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied. *Keokee Consol. Coke Co.* v. *Taylor*, 234 U. S. 224, 227, 34 S. Ct. 856, 58 L. Ed. 1288, 1289."

In *Keokee Consol. Coke Co.* v. *Taylor*, 234 U. S. 224, 34 S. Ct. 856, 857, 58 L. Ed. 1288, it was contended that a statute which prohibited any person, firm or corporation engaged in mining coal or ore, or manufacturing iron or

steel or any other kind of manufacturing to issue for the payment of labor any order unless the same purported to be redeemable for its face value in lawful money of the United States, created an unreasonable discrimination. Said the court:

"* * * it is established by repeated decisions that a statute aimed at what is deemed an evil, and hitting it presumably where experience shows it to be most felt, *is not to be upset by thinking up and enumerating other instances to which it might have been applied equally well, so far as the court can see.* That is for the legislature to judge unless the case is very clear. *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 81, 31 S. Ct. 337, 55 L. Ed. 369, 378; *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157, 160, 33 S. Ct. 66, 57 L. Ed. 164, 169; *Patsone* v. *Pennsylvania,* 232 U. S. 138, 144, 34 S. Ct. 281, 58 L. Ed. [539]. The suggestion that other besides mining and manufacturing companies may keep shops and pay their workmen with orders on themselves for merchandise is not enough to overthrow a law that must be presumed to be deemed by the legislature co-extensive with the practical need." (Italics added.)

Viewing the classification contained in the statute in question in light of the above pronouncements from the Supreme Court of the United States, it is clear that the Legislature in requiring registration of new employees only in cases where a "national recognized union" was on strike did not deny equal protection of the laws to other unions. The statute having been enacted fifteen years ago when management-labor problems were very different from those existing today, we will presume, in accordance with the authorities above discussed, that the need to protect against the importation of undesirable persons into this state to break up strikes existed only in cases in which "national recognized union[s]" were on strike, or at least that the need therefor was much greater. It is not for the members of this court to say that the Legislature should have imposed the same requirement when unions which are not "national recognized union[s]" are on strike.

It should be borne in mind that there is a strong presumption in favor of a legislative classification and of

legitimate grounds of distinction on which the legislature acted.

"Hence, when the classification in a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed." 12 Am. Jur. § 521.

The assailant of a classification in a statute must carry the burden of showing that it does not rest on any reasonable basis, but is essentially arbitrary. Invalid discrimination must be proved or admitted; it is not presumed. Courts need not be ingenious in searching for grounds of distinction to sustain a classification. *Middleton* v. *Texas Power & Light Co.*, 249 U. S. 152, 39 S. Ct. 227, 63 L. Ed. 527. So strong is the presumption that a classification made by the Legislature is based on reasonable grounds that the court in *Arkansas Natural Gas Co.* v. *Arkansas R. Comm.*, 261 U. S. 379, 43 S. Ct. 387, 389, 67 L. Ed. 705, said:

"The reasons which influenced the classification are not disclosed on the face of the act, but the mere absence of such disclosure will not justify the court in assuming that appropriate reasons did not in fact exist. The presumption is that the action of the Legislature —which applies to all alike falling within the class—was with full knowledge of the conditions and that no arbitrary selection of persons for subjection to the prescribed rule was intended."

All of us have in our work on the courts encountered problems similar to those presented in this case. Had they been treated as problems of semantics instead of those of a practical socio-economic content and out of their proper frame of reference, many healthy and worthwhile laws might have been construed as vague and ambiguous and/or unreasonably discriminatory.