STATE of Utah, Plaintiff and Respondent,

v.

Luana Hall HAIG, Defendant and Appellant.

STATE of Utah, Plaintiff and Respondent,

v.

EAGLE BOOK, INC., Defendant and Appellant.

STATE of Utah, Plaintiff and Respondent,

v.

EAGLE BOOK, INC., Defendant and Appellant.

STATE of Utah, Plaintiff and Respondent,

v.

Arthur ADALID, Defendant and Appellant.

STATE of Utah, Plaintiff and Respondent,

v.

Arthur ADALID, Defendant and Appellant.

Nos. 15286, 15288, 15289, 15290 and 15291.

Supreme Court of Utah.

April 12, 1978.

Steven R. McCaughey, Salt Lake City, for defendants and appellants.

Neil Ayervais, Arthur M. Schwartz, Denver, Colo., for Haig.

Robert B. Hansen, Atty. Gen., Theodore L. Cannon, Asst. Atty. Gen., Salt Lake City, Robert L. Newey, Weber County Atty., Ogden, for plaintiffs and respondents.

ELLETT, Chief Justice:

These five cases are consolidated and the question raised is the constitutionality of

U.C.A.,1953, 76–10–1201, 1203 which, so far as material, read:

76–10–1201. . . .

(1) "Material" means anything printed or written or any picture, drawing, photograph, motion picture, or pictorial representation, or any statue or other figure, or any recording or transcription, or any mechanical, chemical, or electrical reproduction, or anything which is or may be used as a means of communication. Material includes undeveloped photographs, molds, printing plates, and other latent representational objects.

(2) "Performance" means any physical human bodily activity, whether engaged in alone or with other persons, including but not limited to singing, speaking, dancing, acting, simulating, or pantomiming.

(3) "Distribute" means to transfer possession of materials whether with or without consideration.

(4) "Knowingly" means an awareness, whether actual or constructive, of the character of material or of a performance. A person has constructive knowledge if a reasonable inspection or observation under the circumstances would have disclosed the nature of the subject matter and if a failure to inspect or observe is either for the purpose of avoiding the disclosure or is criminally negligent.

(5) "Exhibit" means to show.

(6) "Nudity" means the showing of the human male or female genitals, pubic area, or buttocks, with less than an opaque covering, or the showing of a female breast with less than an opaque covering, or any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernably turgid state.

(7) "Sexual conduct" means acts of masturbation, sexual intercourse, or any touching of a person's clothed or unclothed genitals, pubic area, buttocks, or, if the person is a female, breast, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent or actual sexual stimulation or gratification.

(8) "Sexual excitement" means a condition of human male or female genitals when in a state of sexual stimulation or arousal, or the sensual experiences of humans engaging in or witnessing sexual conduct or nudity.

\* \* \* \* \* \*

(12) "Contemporary community standards" means those current standards in the vicinage where an offense alleged under this act has occurred, is occurring, or will occur.

\* \* \* \* \* \*

76–10–1203 (1) Any material or performance is pornographic if:

(a) The average person, applying contemporary community standards, finds that, taken as a whole, it appeals to prurient interest in sex;

(b) It is patently offensive in the description or depiction of nudity, sexual conduct, sexual excitement, sado-masochistic abuse, or excretion; and

(c) Taken as a whole it does not have serious literary, artistic, political or scientific value.

(2) In prosecutions under this part, where circumstances of production, presentation, sale, dissemination, distribution, exhibition, or publicity indicate that the matter is being commercially exploited by the defendant for the sake of its prurient appeal, this evidence is probative with respect to the nature of the matter and can justify the conclusion that, in the context in which it is used, the matter has no serious literary, artistic, political, or scientific value.

(3) Neither the prosecution nor the defense shall be required to introduce expert witness testimony as to whether the material or performance is or is not harmful to adults or minors or is or is not pornographic, or as to any element of the definition of pornographic, including contemporary community standards.

Further, in U.C.A.,1953, 76–10–1204, it is stated that:

(1) A person is guilty of distributing pornographic material when he knowingly:

\* \* \* \* \* \*

(c) Distributes or offers to distribute, exhibits or offers to exhibit, any pornographic material to others; or  . . .

The information upon which the defendants were charged and convicted is in this language:

Said defendants did unlawfully distribute or offer to distribute, exhibit or offer to exhibit, to others, pornographic material, to-wit: a magazine entitled 'HOT BITCH MOTHERS, Volume 1, Number 4'.

The evidence was stipulated to and the cases tried to the court. Included in the stipulation were exhibits consisting of the magazine in question. In finding the defendant guilty as charged, the court stated in its memorandum decision the following:

The Court holds the Statute to be constitutional. The Court, by applying contemporary community standards, finds that the average person would find that Exhibit 'F' contains material which would, taken as a whole, appeal to the prurient interest in sex and the material is patently offensive in the depiction of nudity, sexual conduct and sexual excitement. The material does not have serious literary, artistic, political or scientific value. The magazine in evidence as plaintiff's Exhibit 'F' constitutes pornographic material within the meaning of the statute and is not entitled to constitutional protection.

The finding of the court is not questioned by the appellants except as to the constitutionality of the statute. We paid our respects to pornography in the case of *Salt Lake City v. Piepenberg*[1] recently decided by this Court. We reaffirm our holding by finding that pictures and articles contained in the magazine in this case are offensive to the sensibilities of any decent person. Those who, by hook or crook, seek to find loopholes in the law so as to permit traffic in such filth have no place in our society and should be relegated to that class of depraved people who enjoy looking at and reading the disgusting material.

As to the constitutionality of the statute, the claim is made by the defendants that it is vague and overly broad. A criminal statute is overbroad when it, in a substantial way, prohibits lawful acts as well as unlawful acts. In the instant case, it is contended that the statute in question impinges upon the freedom of speech. Our Utah Constitution guarantees to all persons the inherent and inalienable right "to communicate freely their thoughts and opinions, being responsible for the abuse of that right."[2]

A statute is vague when it fails to inform persons of ordinary intelligence what their conduct must be in order for them to be guilty of a violation thereof.[3]

Whether or not pornography is within the power of the Supreme Court of the United States is of no great importance to us here. That Court, in the case of *Miller v. California*[4] laid down the requisite standards for determining whether an article or a picture is pornographic. It held:

(a) whether 'the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest, . . .

(b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and

(c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

---

1.  Utah, 571 P.2d 1299 (1977).

2.  Constitution of Utah, Article I, sec. 1.

3.  *State v. Packard,* 122 Utah 369, 250 P.2d 561 (1952).

4.  413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973).

Our statute clearly states that the article must appeal to prurient interests in sex (U.C.A.,1953, as amended, 76–10–1203(1)(a)); it specifically defines the prohibited conduct and sets it out in U.C.A.,1953, as amended, 76–10–1201(7) and 76–10–1203(1)(b); and states that in order for the matter to be pornographic, it must have "no serious literary, artistic, political, or scientific value" (U.C.A.,1953, 76–10–1203(2)).

■ Our statute thus complies fully with the requirements set out by the high Court. It does not offend against any constitutional provision. It is a valid statute and those who so flagrantly flout it must pay the penalty for doing so. These defendants have 13 appeals before this Court this month alone that involve pornography convictions.

The judgment is affirmed and the cases are remanded to the district court for the purpose of carrying out the sentences heretofore imposed on each defendant. No costs are awarded.

CROCKETT and HALL, JJ., concur.

MAUGHAN, Justice (concurring in result).

In concurring in the result, I do so for the following reasons. These are set forth in some detail in an attempt to bring something other than an emotional analysis to bear on a recurring problem of constitutional dimensions.

Defendant challenged the constitutionality of Sec. 76–10–1204 under which she was convicted for distributing pornographic material. The trial court ruled the statute was constitutional. It applied contemporary community standards and found that the average person would find Exhibit "F", a magazine, contained material which would, taken as a whole, appeal to the prurient interest in sex, and the material was patently offensive in its depiction of *nudity, sexual conduct,* and *sexual excitement.*

The material did not have serious literary, artistic, political, or scientific value. The trial court found the magazine in evidence constituted pornographic material within the meaning of the statute, and was not entitled to constitutional protection.

On appeal, defendant contends the statute is unconstitutional on the grounds it is facially overbroad, viz., it sweeps within its ambit protected expression; and that its terms are so vague as to violate due process of law, viz., men of common intelligence must necessarily guess as to its meaning and differ as to its application.

Specifically, defendant contends application of the statute is not confined to dissemination of pornographic materials within a commercial context and therefore exceeds the power of the state to regulate such materials. The definitions of "nudity," "sexual conduct," and "sexual excitement" go beyond the description of the type of materials, which may be constitutionally proscribed. The term "prurient" is undefined, thus the statute is void for vagueness as a standard by which to judge pornography.

Since Part 12 of Chapter 10 of the Criminal Code, Title 76, regulates a form of expression, its constitutionality is contingent on confining its scope of regulation to the substantive limits set forth in *Miller v. California.*[1] Any form of expression regulated by this statute, which does not fall within the legal definition of obscenity, is protected by the First Amendment of the Constitution of the United States. This Amendment is made applicable to the States by the Due Process Clause of the Fourteenth Amendment.[2]

Defendant contends the statute is unconstitutional on its face in that it violates the First and Fourteenth Amendments of the Constitution of the United States. She urges she has standing to raise this constitutional issue under the doctrine of overbreadth and urges the statute in its present

---

1. 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

2. See footnote 1, *Young v. American Mini Theatres,* 427 U.S. 50, 52, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

form cannot be limited by judicial construction so as to comply with the constitutional standards concerning obscenity set forth by the United States Supreme Court.

In its brief the state misstates the law regarding overbreadth. When we stir in this delicate area, circumspection is demanded, and cursory analysis discarded.

Where First Amendment freedoms are at stake, the Supreme Court has repeatedly emphasized that precision of drafting and clarity of purpose are essential.[3] Even though a statute may be constitutionally applied to the activities of a particular defendant, that defendant may challenge it on the basis of overbreadth, if it is so drawn as to sweep within its ambit protected speech or expression of other persons not before the court.[4]

The First Amendment overbreadth doctrine, however, represents a departure from the traditional rule that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court. [Citations.] The reason for the special rule in First Amendment cases is apparent: an overbroad statute might serve to chill protected speech. First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the *in terrorem* effect of the statute. [Citations.] Indeed, such a person might choose not to speak because of uncertainty whether his claim of privilege would prevail if challenged. The use of overbreadth analysis reflects the conclusion that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted.[5]

The United States Supreme Court has described its role when the issue is whether an ordinance or statute should be invalidated on its face, as follows:

. . . This Court has long recognized that a demonstrably overbroad statute or ordinance may deter the legitimate exercise of First Amendment rights. Nonetheless, when considering a facial challenge it is necessary to proceed with caution and restraint, as invalidation may result in unnecessary interference with a state regulatory program. In accommodating these competing interests the Court has held that a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts, [Citations] and its deterrent effect on legitimate expression is both real and substantial. [Citations.][6]

Thus, in an overbreadth analysis, we should first delineate the constitutional bounds of protected and unprotected expression. Then it should be determined whether the challenged statute is facially overbroad. Finally, we should determine whether a limiting construction may be placed on the challenged statute to cure its constitutional infirmity.[7]

Defendant first contends the crime of distributing pornographic material as set forth in Sec. 76–10–1204 is facially invalid on the ground the exhibition or distribution is not confined to a commercial context.

" 'Distribute' means to transfer possession of materials whether with or without consideration." Sec. 76–10–1201(3). " 'Exhibit' means to show." Sec. 76–10–1201(5).

Thus, defendant contends the statute denounces as a crime, the act of showing or handing to a friend pornographic material within the confines of one's home, or other

3. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 217–218, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

4. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 933, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).

5. *Bates v. State Bar of Arizona,* 433 U.S. 350, 380, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977).

6. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975).

7. See *Hansen v. The People,* Colo., 548 P.2d 1278, 1280–1281 (1976).

place, within one's constitutionally protected zone of privacy.

In *Stanley v. Georgia*[8] the court observed that although the state had an important interest in the regulation of *commercial distribution* of obscene material, this interest cannot in every context be insulated from all constitutional protections. The Constitution protects the right to receive information and ideas. Freedom of speech and press necessarily protects the right to receive.

.  .  .  This right to receive information and ideas, regardless of their social worth, [Citations] is fundamental to our free society.  .  .  .[9]

The individual further has the fundamental right to be free, except in very limited circumstances, from unwanted intrusions into one's privacy. The court stated the mere categorization of a film as obscene is insufficient justification for such a drastic invasion of personal liberties guaranteed by the First and Fourteenth Amendments.

.  .  .  Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home.  .  .  .[10]

Several other arguments were advanced by the State of Georgia in *Stanley,* which merit review. The state asserted the right to protect the individual's mind from the effects of obscenity. The court responded that the right to control the moral content of a person's thoughts was wholly inconsistent with the philosophy of the First Amendment.

The state asserted that exposure to obscene materials might lead to deviant sexual behavior or crimes of sexual violence. The court expressed the belief that in the context of *private consumption* of ideas and information, it would adhere to the view

that among free men, the deterrents ordinarily to be applied to prevent crime are education, and punishment for violations of the law. In contrast, the court pointed to public distribution of obscene materials; and observed such distribution is subject to different objections, e. g., there is danger the obscene material might fall into the hands of children; or it might intrude upon the sensibilities, or privacy of the general public.

Finally, the state argued that prohibition of possession of obscene materials was a necessary incident to statutory schemes prohibiting distribution. Here, the court said the individual's right to read or observe what he pleases is so fundamental to our scheme of individual liberty, its restriction may not be justified by the need to ease the administration of otherwise valid criminal laws.

In *United States v. Reidel*[11] the court stated:

.  .  .  Whatever the scope of the 'right to receive' referred to in *Stanley*, it is not so broad as to immunize the dealings in which Reidel engaged here—dealings that *Roth* held unprotected by the First Amendment.  .  .  .

The court explained that *Stanley* did not recognize a constitutional right in people like Reidel to distribute or sell obscene material. Reidel had no right to do *business* in obscenity and use the mails in the process.

In *United States v. Thirty-Seven Photographs*[12] it was said:

.  .  .  Whatever the scope of the right to receive obscenity adumbrated in *Stanley*, that right, as we said in *Reidel*, does not extend to one who is seeking, as was Luros here, to distribute obscene materials to the public, nor does it extend to one seeking to import obscene materials

8.  394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

9.  394 U.S. 564, 89 S.Ct. 1247.

10.  394 U.S. 565, 89 S.Ct. 1248.

11.  402 U.S. 351, 355, 91 S.Ct. 1410, 1412, 28 L.Ed.2d 813 (1971).

12.  402 U.S. 363, 376, 91 S.Ct. 1400, 1408, 28 L.Ed.2d 822 (1971).

from abroad, whether for private use or public distribution. . . .

It was noticed obscenity was not within the scope of the First Amendment protection. Hence Congress might declare obscenity contraband and prohibit its importation, as it had elected so to do.

The opinion in *Miller*[13] was predicated on the theory the States had a legitimate interest in prohibiting dissemination or exhibition of obscene materials when the *mode of dissemination* carried with it a significant danger of offending the sensibilities of unwilling recipients, or exposure to juveniles. According to the court, it is in this context it defined standards which must be used to identify obscene material; that a State might regulate without infringing on the First Amendment.

The language of *Miller* is replete with references, signifying the commercial context, within which the State had an interest in regulating the mode of dissemination of obscenity. It was observed that under the holdings that day, (there were five cases) no one would be subject to prosecution for the *sale* or *exposure* of obscene materials, unless these materials depicted or described patently offensive "hard core" sexual conduct, specifically defined by the regulating state law, as written or construed. The court expressed satisfaction that the specific prerequisites set forth would provide fair notice to a *dealer* in such materials that his *public* and *commercial · activities* might bring prosecution.

The court explained that it could not equate the free and robust exchange of ideas and political debate with *commercial exploitation* of obscene material. The court observed that *public portrayal* of hard core sexual conduct for its own sake and for the ensuing *commercial gain* was a different matter. The court commented it did not see the harsh hand of censorship and repression of political liberty lurking in *every*

*regulation* of *commercial exploitation* of human interest in sex.

In *Paris Adult Theatre I v. Slaton*[14] we find the State to have had a long-recognized legitimate interest in regulating the use of obscene material in *local commerce* and in all *places of public accommodation,* as long as the regulations did not run afoul of specific constitutional prohibitions. It held there was a legitimate state interest in stemming the tide of *commercialized obscenity,* even assuming it was feasible to enforce effective safeguards against exposure to juveniles and passersby.

The court continued by explaining that a *commercial venture,* such as a motion picture house, was not private for the purposes of civil rights litigation. The right of privacy and a place of *public accommodation* are mutually exclusive. It elaborated by stating that where communication of ideas, protected by the First Amendment, was not involved, or the particular privacy of the home protected by *Stanley,* or any of the other "areas or zones" of constitutionally protected privacy, the mere fact that, as a consequence, some human utterances or thoughts might be incidentally affected; did not bar the State from acting to protect legitimate state interests.

*Commercial exploitation* of depictions, descriptions, or exhibitions of obscene conduct *on commercial premises* open to the adult *public* falls within a State's broad power to *regulate commerce* and protect the *public environment. Commerce* in obscene materials is unprotected by any constitutional doctrine of privacy. The court held the States had a legitimate interest in regulating *commerce in obscene material,* and in regulating *exhibition of obscene material in places of public accommodation.*

In *Kaplan v. California,*[15] it was ruled *commercial exposure* and *sale* of obscene materials to anyone, including consenting adults, is subject to state regulation.

13. 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

14. 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973).

15. 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973).

In *United States v. 12 200 Ft. Reels of Film*[16] the court stated import restrictions and searches of persons at the national border rested on different rules of constitutional law from domestic regulations. The Constitution has given Congress broad powers to regulate commerce with foreign nations, Art. I, § 8, cl. 3. Congress has plenary power to regulate imports, and obscene material is not protected by the First Amendment. Within this context, the court stated *Stanley* depended not on any First Amendment right to *purchase* or possess obscene materials, but on the right to privacy in the home. *Stanley* rested on the explicitly narrow and precisely delineated privacy right; *Stanley* represented a line of demarcation. The court declined to extend the limited holding of *Stanley* to permit importation of admittedly obscene material simply because it was imported for private use only.

The court cited its prior limitations on *Stanley* as set forth in *United States v. Reidel*[17] and *United States v. Thirty-Seven Photographs*[18] and stated there was no correlative right to transport obscene material in interstate commerce. Thus *Stanley* does not permit one to go abroad and bring obscene material into the country for private purposes. *Stanley's* emphasis was on the freedom of thought and mind in the privacy of the home, but a port of entry is not a traveler's home. The court ruled the Constitution did not compel and Congress had not authorized an exception for private use of obscene materials.

Finally in *United States v. Orito*[19] the court rejected the idea that some zone of constitutionally protected privacy followed obscene material when it was moved outside the home area protected by *Stanley*. The Constitution extends special safeguards to the privacy of the home, but the viewing of obscene films in a commercial theater or transporting such films in common carriers · in interstate commerce has no claim to such special consideration.

It is hardly necessary to catalog the myriad activities that may be lawfully conducted within the privacy and confines of the home, but may be prohibited in public. The Court has consistently rejected Constitutional protection for obscene material outside the home. . .

However, the court in *Orito* determined there was no constitutionally protected right of privacy involved. The court stated it could not say the Constitution forbade comprehensive federal regulation of interstate transportation of obscene material merely because such transport might be by private carriage or because the material was intended for the private use of the transporter. Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral, or economic nature.

The foregoing review indicates that if the Constitutional power conferred on Congress to regulate foreign and interstate commerce is not involved, the interest of the state in regulating pornography must be balanced with the constitutionally protected interest of the individual as set forth in *Stanley*. *Miller, Paris Adult Theatre I,* and *Kaplan* indicate the state's interest prevails when the mode of dissemination of pornographic material is public or within a commercial context. The state has the right to regulate a mode of dissemination where there is a significant danger of offending the sensibilities of unwilling recipients or exposure to juveniles. The state further has the right to regulate commercial exploitation of human interest in sex in local commerce and in all places of public accommodation. The state's interest in the regulation of commercial distribution of obscene material does not provide a sufficient basis

---

**16.** 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973).

**17.** See note 11 supra.

**18.** See note 12 supra.

**19.** 413 U.S. 139, 142–143, 93 S.Ct. 2674, 2677, 37 L.Ed.2d 513 (1973).

to impinge on the individual's constitutionally protected rights, viz., the state's interest is an insufficient justification to invade the personal liberties guaranteed by the First and Fourteenth Amendments.

Insofar as Sec. 76–10–1204 denounces as a crime the distribution of pornographic material within a noncommercial context and within a zone of privacy accorded constitutional protection, it is overly broad. However, this section can be construed so as to limit its application to the permissible ambit of state regulation in light of the broad separability provision in Sec. 76–10–1211 and the expressed legislative intent in the last sentence of Sec. 76–10–1204(1), viz., it is a separate offense each day the pornographic material is displayed or exhibited in a public place with intent to distribute or exhibit it to others.

Defendant contends the definitions of "nudity," "sexual conduct," and "sexual excitement" in subsections (6), (7), (8), respectively in Sec. 76–10–1201 include a type of material which may not be constitutionally proscribed under *Miller v. California.*

In *Miller v. California,*[20] the court stated state statutes designed to regulate obscene materials must be carefully limited. The court confined the permissible scope of such regulation to works which depict or describe sexual conduct, which must be specifically defined by applicable state law, as written or authoritatively construed. The state offense must be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

The type of patently offensive conduct which the state could define by law and regulate was described as follows:

(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

The court elaborated on this concept in *Hamling v. United States,*[21] wherein it stated:

*Miller,* in describing the type of material which might be constitutionally proscribed, [Citations] was speaking in terms of substantive constitutional law of the First and Fourteenth Amendments. [Citations.] While the particular descriptions there contained were not intended to be exhaustive, they clearly indicate that there is a limit beyond which neither legislative draftsmen nor juries may go in concluding that particular material is 'patently offensive' within the meaning of the obscenity test set forth in the *Miller* cases. . . .

In *Jenkins v. Georgia*[22] the court, in reference to the patently offensive element of *Miller,* stated that nudity alone is not enough to make material legally obscene under the *Miller* standards.

The definitions in Sec. 76–10–1201 represent a good-faith effort of the legislature to comply with the *Miller* standards. Nevertheless, the definitions must be judged by the examples set forth in *Miller* as to the *type* of material depicting sexual conduct in a patently offensive way which the legislature may regulate.

The definition of nudity is not confined to a lewd exhibition of the genitals or to any type of depiction or description of patently offensive "hard core" sexual conduct. The mere showing of the buttocks or female breast does not comport with the "patently offensive" element of *Miller,* insofar as this definition is utilized in setting forth the crime of distributing pornographic material in Sec. 76–10–1204.

20. 413 U.S. 15, 23–25, 93 S.Ct. 2607, 37 L.Ed.2d 419.

21. 418 U.S. 87, 114, 94 S.Ct. 2887, 2906, 41 L.Ed.2d 590 (1974).

22. 418 U.S. 153, 161, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974).

The state mistakenly points to what it considers to be similarity in definitions of "nudity" and "sexual excitement" in the Utah Code and that in the Oregon Code, Sec. 167.060(5), (11), Ore.Rev.Stat. However, a review of Sec. 167.087, Ore.Rev. Stat., wherein the elements of the crime of disseminating obscene material are set forth, indicates this statute applies only to depictions or descriptions in a patently offensive manner, of sadomasochistic abuse or sexual conduct. The definitions of nudity and sexual excitement in the Oregon Code are only elements in crimes involving obscenity and minors, Secs. 167.065; 167.070; 167.080 and the crime of publicly displaying nudity or sex for advertising purposes, Sec. 167.090, Ore.Rev.Stat.

In *Miller v. California,* in footnote 6, 413 U.S., 24, 93 S.Ct. [2607,] 2615 the court cited Hawaii and Oregon as examples of state laws directed at depiction of defined physical conduct as opposed to expression. However, the court admonished: "In giving the Oregon and Hawaii statutes as examples, we do not wish to be understood as approving of them in all other respects nor as establishing their limits as the extent of state power."

The definition of "sexual excitement" in 76–10–1201(8) comports with the *Miller* standard, except for the phrase "sensual experiences of humans . . . witnessing . . . nudity." The term "nudity" should be construed as previously noted to a description or depiction of a lewd exhibition of the genitals or other patently offensive "hard core" sexual conduct, when this element is part of the crime set forth in Sec. 76–10–1204.

The definition of "sexual conduct" in Sec. 76–10–1201(7) complies with the *Miller* standard insofar as it sets forth descriptions of ultimate sex acts, normal or perverted, actual or simulated, masturbation, and any lewd exhibition of the genitals. However the phrase "any touching of a person's clothed . . . buttocks, or, . . . female, breast . . . in an act of apparent or actual sexual stimulation or grati-fication" is overly broad. This conduct, alone, is insufficient to qualify under the *Miller* standard as a type of patently offensive "hard core" sexual conduct. In applying this definition as an element of the crime provided in Sec. 76–10–1204, it should be construed with the aforementioned limitation.

Since the challenged statute is readily subject to a narrowing construction without interfering with the legislative function, defendant's challenge of the statute as unconstitutional on its face must fail. Section 76–10–1211 provides that if any clause, sentence, or part of the act is adjudged invalid, the judgment shall not invalidate the remainder of the act. The entire construction of the act demonstrates a legislative intent to comply with the standards set forth in *Miller*; therefore, any judicial interpretation construing the provisions in a manner consonant with *Miller* would be a construction in compliance with the legislative intent.

Finally, defendant contends the failure of the legislature to define the term "prurient" renders the statute void on the ground of vagueness. This term is an integral part of the *Miller* standards, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed. 419 viz., part (a). The court cites *Roth v. United States*[23] as the source of the prurient interest standard. In *Roth*, in footnote 20, the initial definition of prurient is derived from Webster's New International Dictionary (Unabridged 2d ed., 1949).

'Prurient' is defined as ' . . . Itching; longing; uneasy with desire or longing; of persons, having itching, morbid, or lascivious longing; of desire, curiosity, or propensity, lewd. . . . '

The court in *Roth* observed that sex and obscenity were not synonymous. Obscene material was explained to be material which dealt with sex in a manner appealing to prurient interest.

The legislature in defining pornographic material adopted the tripartite standards of *Miller* in Section 76–10–1203(1). Subdivision (a) therein provides:

**23.** 354 U.S. 476, 487, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

The average person, applying contemporary community standards, finds that, taken as a whole, it appeals to prurient interest in sex; . . ..

Section 76–1–106, Utah Criminal Code provides:

. . . All provisions of this code and offenses defined by the laws of this state shall be construed according to the *fair import of their terms* to promote justice and to effect the objects of the law and general purposes of section 76–1–104. [Emphasis supplied.]

It was unnecessary for the legislature to define the term "prurient," since the fair import of that term coincides both with the dictionary definition and the constitutional standard for obscenity established by the United States Supreme Court.

The conviction of defendant, Haig, should be affirmed. The material she distributed can be deemed pornographic as a matter of law, even after the statute has been construed to conform with the *Miller* standards.

WILKINS, J., concurs in the views expressed in the concurring opinion of MAUGHAN, J.