531 F.Supp. 987 (1982)
HOME BOX OFFICE, INC., a Delaware corporation, Community Television of Utah, Inc., a Nevada corporation, Community Cable of Utah, Inc., a Colorado corporation, Utah Satellite, Inc., a Utah corporation, and Wasatch Community TV, Inc., a Utah corporation, Plaintiffs,
v.
Hon. David L. WILKINSON, Attorney General of the State of Utah, and Hon. L. Ted Cannon, County Attorney of Salt Lake County, individually and in their official capacities and as representatives of the class of all persons empowered to prosecute violations of Utah Code Ann. § 76-10-1229 (1953), Defendants.
Civ. No. C 81-0331J.
United States District Court, D. Utah, C. D.
January 12, 1982.
*988 *989 Floyd Abrams, Dean Ringel, Susan Buckley, Faith Wender, New York City, Donald B. Holbrook, LeGrand R. Curtis, Jr., Salt Lake City, Utah, for plaintiffs.
Robert R. Wallace, Asst. Atty. Gen., Jerry Kaufman, Salt Lake City, Utah, for defendants.
Brenda L. Fox, James H. Ewalt, James R. Jamison, Jr., Robert St. John Roper, Henry Goldberg, Phillip L. Spector, Washington, D.C., amicus curiae, for National Cable Television Assn.

MEMORANDUM OPINION
JENKINS, District Judge.
In its 1981 Session, the Utah Legislature enacted a statute which would punish as a criminal any person who "shall knowingly distribute by wire or cable any pornographic or indecent material to its subscribers." Utah Code Ann. § 76-10-1229(1) (supp. 1981).[1] The key terms "pornographic" and *990 "indecent" are defined wholly by reference to other statutes.[2] Violations of the section are deemed to be class A misdemeanors.[3]
The statute was to go into effect on May 11, 1981. On May 1, 1981, the plaintiffs commenced this action against the defendant Attorney General of Utah and the defendant County Attorney for Salt Lake County, Utah, individually and as representatives of the class of persons empowered to enforce the provisions of Utah Code Ann. § 76-10-1229. The class as described includes more than 250 persons. The plaintiffs, all either national or local cable television distributors or franchisees, seek a declaratory judgment determining that § 76-10-1229 on its face violates the First Amendment[4] and is unconstitutional for reasons of overbreadth,[5] as well as injunctive relief prohibiting the enforcement of that section by any member of the defendant class. Additionally, plaintiffs sought a temporary restraining order and a preliminary injunction prohibiting enforcement of the statute on or after the statute's effective date of May 11, 1981.
On May 7, 1981, counsel for the parties appeared before this Court for a hearing on the plaintiffs' motion for a TRO, at which time argument was heard, the defendant class was provisionally certified, and the requested relief was granted by this Court.[6] That order remained in effect by agreement of the parties until the conclusion of a final hearing on the merits. Notice of the Temporary Restraining Order was given to members of the class by mail on or about May 12, 1981.
On November 16, 1981, counsel appeared before this Court for a hearing on the defendants' motions to dismiss or stay the proceedings, and on the plaintiffs' motion to certify the defendant class on a final basis, to grant summary judgment on the merits against the defendants and to make permanent the injunctive relief heretofore entered against the defendant class. Appearances of counsel were as follows:
Floyd Abrams, Esq., Faith Wender, Esq., LeGrand Curtis, Esq., and Donald B. Holbrook, Esq., for the plaintiffs;
Robert Wallace, Esq. for the defendant Attorney General and Jerry Kaufman, Esq. for the defendant County Attorney.
Having considered the pre-hearing memoranda submitted by counsel and having given careful attention to the arguments of counsel, from the bench I denied both of the defendants' motions and granted the plaintiffs' motions to certify the defendant class for summary judgment, and to make permanent *991 the injunction forbidding enforcement of Utah Code Ann. § 76-10-1229 by any member of the defendant class. At that time, however, I reserved the right to express in a more amplified form the underlying rationale for deciding the matter as I have. The following comments reflect an earnest effort to do just that.
As noted above, plaintiffs challenge § 76-10-1229 as being unconstitutionally overbroad on its face, and as reaching forms of expression that are protected by the First Amendment. Such a challenge raises complex questions of First Amendment rights and the power of the federal courts vis-a-vis the States. As the late Justice Maughan of the Utah Supreme Court reminds us, "[w]hen we stir in this delicate area, circumspection is demanded, and cursory analysis discarded." State v. Haig, 578 P.2d 837, 841 (Utah 1978) (Maughan, J., concurring).
It is certainly a "matter of no small difficulty" to determine when a state statute may properly be held void on its face, or when such "summary action" is inappropriate. Coates v. City of Cincinnati, 402 U.S. 611, 617, 91 S.Ct. 1686, 1690, 29 L.Ed.2d 214 (1971) (Black, J.); Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). Caution is especially warranted in cases such as this, where the statute is challenged as unconstitutional by its very terms, and not just as it may be applied to particular plaintiffs and particular facts on a case-by-case basis. See Younger v. Harris, 401 U.S. 37, 52-53, 91 S.Ct. 746, 754-755, 27 L.Ed.2d 669 (1971). Nevertheless, important policies justify the exercise of judicial power to invalidate overly broad statutes challenged under the First Amendment:
The reason for the special rule in First Amendment cases is apparent: an overbroad statute might serve to chill protected speech. First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the in terrorem effect of the statute. See NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). Indeed, such a person might choose not to speak because of uncertainty whether his claim of privilege would prevail if challenged. The use of overbreadth analysis reflects the conclusion that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted.
Bates v. State Bar of Arizona, 433 U.S. 350, 380, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977). See also Dombrowski v. Pfister, 380 U.S. 479, 486-487, 85 S.Ct. 1116, 1120-1121, 14 L.Ed.2d 22 (1965).
If the rule were otherwise, "the contours of regulation would have to be hammered out case by case  and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation." Dombrowski, supra, 380 U.S. at 487, 85 S.Ct. at 1121.
In Erznoznik v. City of Jacksonville, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), the Supreme Court set forth a summary of standards for the judicial treatment of First Amendment overbreadth challenges:
This Court has long recognized that a demonstrably overbroad statute or ordinance may deter the legitimate exercise of First Amendment rights. Nonetheless, when considering a facial challenge it is necessary to proceed with caution and restraint, as invalidation may result in unnecessary interference with a state regulatory program. In accommodating these competing interests the Court has held that a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts, see Dombrowski v. Pfister, 380 U.S. 479, 497, 85 S.Ct. 1116, 1126, 14 L.Ed.2d 22 (1965), and its deterrent effect on legitimate expression is both real and substantial. See Broadrick v. Oklahoma, 413 U.S. 601, 612-615, 93 S.Ct. 2908, 2915-2917, 37 L.Ed.2d 830 (1973). See generally Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970). *992 Id., 422 U.S. at 216, 95 S.Ct. at 2276. Thus, in applying overbreadth analysis to § 76-10-1229, "we should first delineate the constitutional bounds of protected and unprotected expression. Then it should be determined whether the challenged statute is facially overbroad. Finally, we should determine whether a limiting construction may be placed on the challenged statute to cure its constitutional infirmity," State v. Haig, supra, 578 P.2d at 841 (Maughan, J. concurring), or whether the likelihood of such a narrowing construction by a state court is sufficient to justify abstention by this Court in favor of state court proceedings commenced at some time in the future. Cf. Red Bluff Drive-In, Inc. v. Vance, 648 F.2d 1020, 1032-1036 (5th Cir. 1981).
Regulation by the government of the public dissemination of written or pictorial materials deemed "pornographic" or "obscene" has been the subject of controversy extending back at least two centuries. Compare e.g., Regina v. Read, 11 Mod.Rep. 142 (1708 [6th year of Queen Anne]) (obscenity matters only cognizable in ecclesiastical courts) with Rex v. Curl, 2 Stra. 788 (K.B. 1727) (distribution of obscenity indictable at common law); see also Rex v. Wilkes, 4 Burr. 2527 (D.B.1770) (John Wilkes "Essay on Women" held indictable at common law as "obscene"); Commonwealth v. Holmes, 17 Mass. 335 (1812); Willis v. Warren, 1 Hilt. 590, 17 How.Pr. 100; Dugdale v. Regina, Dears. 64; Knowles v. State, 3 Day 103 (Conn.1805); Commonwealth v. Sharpless, 2 Serg. & R. 91, 7 Am.Dec. 632 (Pa.1815); Konda v. United States, 166 F. 91, 92 (C.C.A., 7th Cir. 1908) (re: 69-page pamphlet, "A Victim of Circumstances, or Memoirs of a Carniolian Priest," printed "in the Slovenian language" held obscene by lower court); In re Worthington Co., 30 N.Y.S. 361 (S.Ct.1894) (Payne's edition of "Tales of the Arabian Nights" held not obscene); Rosen v. United States, 161 U.S. 29, 31, 16 S.Ct. 434, 40 L.Ed. 606 (1896) ("picture of females in different attitudes of indecency" published in paper "partially covered with lamp black that could be easily erased with a piece of bread" held obscene under Rev.Stat. § 3893); 81 A.L.R. 801; Lockhart & McClure, "Literature, the Law of Obscenity, and the Constitution," 38 Minn.L.Rev. 295 (1954); C. Rembar, The Law of the Land 354 n. (1980).
As early as 1712, Massachusetts made it criminal to publish any "filthy, obscene or profane" mockery of a religious service. Acts and Laws of the Province of Massachusetts Bay, c. CV, § 8 (1712), Mass. Bay Col. Charters & L. 399 (1814). By 1956, all of the states as well as the federal government had some form of statutory regulation governing obscenity. See Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957).[7]
The United States Supreme Court has spoken often and at length on the subject, particularly in light of the First Amendment.[8] See e.g., Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Kingsley Int'l Pictures Corp. v. Regents, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959); Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966); Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966); Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 *993 (1966); Ginsburg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). Over the years, High Court has been seriously divided on the definition of the constitutionally protected range of free expression vs. the constitutionally permissible scope of state regulation of hard-core "pornographic" or "obscene" materials. See e.g., Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 78-83 & nn. 4-8, 93 S.Ct. 2628, 2644-2647 & nn. 4-8, 37 L.Ed.2d 446 (1973) (Brennan, J. dissenting).[9] However obscenity may be defined, a majority of the Supreme Court has permitted significant state regulation, holding hard-core pornography to be beyond the limits of First Amendment protection. See Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957).[10]
The current formulation of the definitional boundary is to be found in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and its judicial progeny. See Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); Ward v. Illinois, 431 U.S. 767, 97 S.Ct. 2085, 52 L.Ed.2d 738 (1977); Jenkins v. Georgia, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974); Splawn v. California, 431 U.S. 595, 97 S.Ct. 1987, 52 L.Ed.2d 606 (1977). In Miller, a five-man majority[11] joined in an opinion delivered by Chief Justice Burger which recounted prior Court activity in this area and commented as follows:
This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment ... "The First and Fourteenth Amendments have never been treated as absolutes [footnote omitted]" Breard v. Alexandria, 341 U.S. [622] at 642, 71 S.Ct. 920 at 932, 95 L.Ed. 1233 [(1951)], and cases cited.... We acknowledge, however, the inherent dangers of undertaking to regulate any form of expression. State statutes designed to regulate obscene materials must be carefully limited.... As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by *994 the applicable state law, as written or authoritatively construed. A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value. (Emphasis added.)
Id., 413 U.S. at 23-24, 93 S.Ct. at 2614-2615 (citations and footnote omitted).
Having thus defined the appropriate sphere of state regulation, the Court went on to set forth the procedural standards required to be followed in attempting such regulation:
The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole appeals to the prurient interest, ...; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.
Id., 413 U.S. at 24, 93 S.Ct. at 2615 (citations omitted).
The inquiry in obscenity cases is thus confined. The Court left resolution of individualized questions of fact and law to "the jury system, accompanied by the safeguards that judges, rules of evidence, [the] presumption of innocence, and other protective features provide ..." Id., 413 U.S. at 26, 93 S.Ct. at 2616, again reasserting that "no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive "hard core" sexual conduct specifically defined by the regulating state law, as written or construed." The Court was "satisfied that these specific prerequisites will provide fair notice to a dealer in such materials that his public and commercial activities may bring prosecution." Id., 413 U.S. at 27, 93 S.Ct. at 2616 (citations omitted).
The Miller decision has often been capsulized in public comment as the "community standards" case, as defining the reach of permissible state regulation of expression through reference to local community standards, whatever they may be. The High Court since Miller has made it clear, however, that "it would be a serious misreading of Miller to conclude that juries have unbridled discretion in determining what is `patently offensive'." Jenkins v. Georgia, 418 U.S. 153, 160, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974). On the contrary, the criteria and examples set forth in Miller were "certainly intended to fix substantive constitutional limitations [on] the type of material subject to such a determination." Id., 418 U.S. at 160-161, 94 S.Ct. at 2755.
The Supreme Court, for example, has made it abundantly clear that nudity alone is not sufficient to make material legally obscene under the Miller standards. See Jenkins v. Georgia, supra, 418 U.S. at 161, 94 S.Ct. at 2755; Schad v. Mt. Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed. 2d 671 (1981). It is also clear that purportedly obscene material will "be judged by its impact on an average person, rather than a particularly sensitive or susceptible person  or indeed a totally insensitive one." Miller v. California, supra, 413 U.S. at 33, 93 S.Ct. at 2620.[12]
States may not go beyond Miller in prescribing criminal penalties for distribution of sexually oriented materials. For better[13] or worse,[14]Miller establishes the analytical boundary of permissible state involvement in the decision by HBO and others *995 to offer, and the decision by subscribers to receive, particular cable TV programming. Accord, Hamling v. United States, 418 U.S. 87, 114, 94 S.Ct. 2887, 2906, 41 L.Ed.2d 590 (1974).
I think it is important to once again note that the Utah statute dealing with pornograpy, Utah Code Ann. §§ 76-10-1201 et seq., is not challenged here by the plaintiffs nor is its constitutionality under Miller otherwise in question in these proceedings. Whenever that question has arisen, both state and federal courts have affirmed the constitutionality of that statute. See e. g., State v. Haig, 578 P.2d 837 (Utah 1978); State v. Piepenberg, 602 P.2d 702 (Utah 1979); Piepenberg v. Cutler, 507 F.Supp. 1105 (D.Utah 1980), affirmed 649 F.2d 783 (10th Cir. 1981). It seems to me that the Miller case was the bedrock upon which the state legislature rested when it enacted its statute on pornography; looking to XX-XX-XXXX,[15] one finds explicit adoption by the state legislature of the three-prong test in dealing with pornographic material that Miller says must be applied.
While it is not necessary that a state statute track exactly the language of Miller in order to pass constitutional muster, see Hamling v. United States, supra, 418 U.S. at 115, 94 S.Ct. at 2906, a state legislature is not free to act in disregard of its substantive requirements. Since the cable TV indecency statute § 76-10-1229(1) & (4), like the pornography statute just described, "regulates a form of expression, its constitutionality is contingent on confining its scope of regulation to the substantive limits set forth in Miller v. California." State v. Haig, 578 P.2d 837, 840 (Utah 1978) (Maughan, J. concurring).
In this case that has not been done.
I'm an old legislator. I am appreciative of the legislative process. I was President of the State Senate some years ago. I respect those who participate in the legislative process very, very much. Nevertheless the extremely difficult drafting problems that exist in any effort to deal with the areas of expression requires exquisite care by the legislature and conscientious conformity to exacting constitutional standards. Free expression is so important to the well being of our whole social structure that any limitation must be viewed by the most critical of legislative eyes.
Section 76-1-106 of the Utah Code directs that the provisions of that code (the criminal code) and the offenses defined therein "shall be construed according to the fair import of their terms to promote justice and to effect the objects of the law," and other express purposes, such as "[defining] adequately the conduct and mental state which constitute each offense and safeguard[ing] conduct that is without fault from condemnation as criminal." Utah Code Ann. § 76-1-104(2) (1978). Construing § 76-10-1229 according to the fair import and even the plain meaning of its terms, it becomes readily apparent that it seeks to deal with subject matter beyond hard-core pornography  to go beyond Miller  and to do so without any of the safeguards mandated by Miller.[16]
*996 For example, through the definitions adopted by reference from § 76-10-1227(2), "nude or partially denuded figures" are encompassed within the reach of § 76-10-1229(4), it is well settled that nudity falls well within the protection afforded by the First Amendment, Jenkins v. Georgia, 418 U.S. 153, 161, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974); Schad v. Mt. Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), even when viewed by minors. Erznoznik v. City of Jacksonville, 422 U.S. 205, 213 & n. 10, 95 S.Ct. 2268, 2275 & n. 10, 45 L.Ed.2d 125 (1975). To that extent, the statute is clearly encroaching upon protected expression in an unconstitutional manner and is facially defective.[17]
Beyond nudity, the section would extend to "descriptions or depictions of illicit sex or sexual immorality" as detailed in § 76-10-1227(1). As the Supreme Court emphasized in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), "sex and obscenity are not synonymous.... The portrayal of sex, e.g., in art, literature and scientific works, is not itself sufficient reason to deny the material the constitutional protection of freedom of speech and press." 354 U.S. at 487, 77 S.Ct. at 1310. Accord, Kois v. Wisconsin, 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972) (per curiam); Jenkins v. Georgia, 418 U.S. 153, 161, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974). A court must look at the context of the material in the manner specified by Miller. Yet under section 1229(4) sex and unprotected obscenity are made synonymous. It is elementary that merely calling something obscene doesn't make it so. Merely labeling something indecent doesn't make it so.
Counsel for the state argues that such a broad extension of legislative authority into heretofore proscribed areas may be justified by the state's interests in protecting children, and that materials accessible to children should be governed by standards more strict than the Miller standards. Cf. Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).
While in Ginsberg v. New York, the Supreme Court adopted a variation of the then-current test of obscenity announced in Roth v. United States, supra, and Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) (plurality opinion), counsel cites no case in which the Court has had opportunity to consider that issue in light of Miller. See Erznoznik v. City of Jacksonville, supra, 422 U.S. at 213 n. 10, 95 S.Ct. at 2275 n. 10. Since Ginzberg, the Court has expressed the view that "minors are entitled to a significant measure of First Amendment protection, see Tinker v. Des Moines School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them...." Erznoznik v. City of Jacksonville, supra, 422 U.S. at 212-213, 95 S.Ct. at 2275. Far from being "narrow and well-defined" § 76-10-1229 covers a broad expanse of expression.[18] *997 The statute does not exclude constitutionally protected expression from the reach of the criminal sanction; on the contrary, it embraces such expression, deterring it in a "real and substantial" way, even when judged in relation to the plainly legitimate sweep of such a statute, or of the state legislative power. Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973).
Section 76-10-1229(1) & (4) is unconstitutionally overbroad as to minors. It is unconstitutionally overbroad as to everyone. Even if counsel's arguments as to the state's interests in children are accepted, the statute remains overbroad. The statute itself makes no reference to children; by its terms it would be equally applicable to cable TV programming reaching homes and environments having no children at all. As long ago as Butler v. Michigan, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957), the Supreme Court invalidated laws forbidding distribution of specific reading materials to adults in the name of protecting hypothetical minors.
As Justice Frankfurter observed in Butler,
We have before us legislation not reasonably restricted to the evil with which it is said to deal. The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual, now enshrined in the Due Process Clause of the Fourteenth Amendment, that history has attested as the indispensable conditions for the maintenance and progress of a free society.
Id., 352 U.S. at 383-384, 77 S.Ct. at 525-526. See also Pinkus v. United States, 436 U.S. 293, 297-298, 98 S.Ct. 1808, 1811-1812, 56 L.Ed.2d 293 (1978) (children not considered in determining "community standards").
The legislature must "use delicate tools when drafting statutes with potential impact on first amendment rights or ... risk having their central purpose thwarted by a finding of facial invalidity." Note, 49 N.Y. U.L.Rev. 532, 534 (1974). The state's purpose, however praiseworthy, cannot be pursued by means that broadly stifle fundamental liberties when the end can be more narrowly achieved. The legislature must achieve its goal "by means which have a `less drastic' impact on the continued vitality of First Amendment freedoms." United States v. Robel, 389 U.S. 258, 268, 88 S.Ct. 419, 426, 19 L.Ed.2d 508 (1967); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); L. Tribe, American Constitutional Law 722-724 (1978).[19]
While "commercial exposure and sale of obscene materials to anyone, including consenting adults, is subject to state regulation," Kaplan v. California, 413 U.S. 115, 120, 93 S.Ct. 2680, 2684, 37 L.Ed.2d 492 (1973), transmission and delivery of nonobscene TV programming is not, at least not through a state criminal statute that runs so far afield of the standards set forth in Miller v. California, supra. "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963).
Counsel for the defendants urges that this Court either (1) adopt a narrowing construction of the challenged statute to bring it within permissible constitutional limits, see United States v. 12 200-ft. Reels of Super 8 mm. Film, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), or (2) abstain from proceeding herein in order to allow *998 the state courts an opportunity to construe the statute more narrowly at some indefinite time in the future.[20] Compare Red Bluff Drive-In, Inc. v. Vance, 648 F.2d 1020, 1032-1036 (5th Cir. 1981).
Section 76-10-1229(1) & (4) "by its plain terms is not readily susceptible of a narrowing construction." Erznoznik v. City of Jacksonville, supra, 422 U.S. at 216, 95 S.Ct. at 227. To reduce its terms to those outlined in the Miller opinion would be to limit them right out of existence. On the other hand, to limit its terms to only that program material that is "obscene" as to minors, cf. Ginsberg v. New York, supra; Erznoznik v. City of Jacksonville, supra, would require a totally original rewriting of the statute. For this Court to "introduce words of limitation" into an overbroad criminal statute in order to render it constitutional "would to some extent, substitute the judicial for the legislative department.... To limit this statute ... would be to make a new law, not to enforce an old one. This is no part of our duty." United States v. Reese, 92 U.S. 214, 221, 23 L.Ed. 563 (1875); see also L. Tribe, American Constitutional Law 717 & n. 4 (1978). I have too much respect for the legislature to do that. That's their task  not mine. Rewriting a state statute by judicial amendment would in this case raise additional concerns of federalism as well as separation of powers. Cf. Red Bluff Drive-In, Inc. v. Vance, supra, 648 F.2d at 1035; Moore v. Sims, 442 U.S. 415, 428, 99 S.Ct. 2371, 2379, 60 L.Ed.2d 994 (1979).
Even further, to construe the otherwise plain terms of the statute to a meaning consistent with Miller "simply exchanges overbreadth for vagueness." L. Tribe, supra, at 716;
The clarity and preciseness of the provision in question make it impossible to narrow its indiscriminately cast and overly broad scope without substantial rewriting. The situation here is different from that in cases such as United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561, where the Court is called upon to consider the content of allegedly vague statutory language. Here, in contrast, an attempt to "construe" the statute and to probe its recesses for some core of constitutionality would inject an element of vagueness into the statute's scope and application; the plain words would thus become uncertain in meaning only if courts proceeded on a case-by-case basis to separate out constitutional from unconstitutional areas of coverage. This course would not be proper, or desirable, in dealing with a section which so severely curtails personal liberty.
Aptheker v. Secretary of State, 378 U.S. 500, 515-516, 84 S.Ct. 1659, 1668-1669, 12 L.Ed.2d 992 (1964). Counsel urges that "[w]e are talking about not what the statute is, but its susceptib[ility] to becoming something different, ..." Hearing Transcript at 24, yet § 76-10-1229(1) & (4) offer none of the ambiguities presented by the adjective phrasings construed in cases such as United States v. 12 200-ft. Reels, supra, or Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), both relied upon by counsel. Indeed, as counsel for plaintiffs points out, "[w]e don't have a statute with adjectives. We have a statute with nouns.... Ours is not a vagueness situation. We do know what the words mean." Hearing Transcript at 15, 27.
The clarity of the statute and its readily apparent overbreadth also militate against abstention. While Railroad Comm. of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), counsels abstention if decision of a constitutional issue may be rendered needless by a state court determination of an issue of state law that resolves the matter, such deference is unwarranted where a statute speaks so broadly that constitutionally protected expression would clearly be inhibited. Kusper v. Pontikes, 414 U.S. 51, 54-56, 94 S.Ct. 303, *999 306-307, 38 L.Ed.2d 260 (1973) (abstention held inappropriate where challenged statute was not "fairly susceptible" of a constitutional construction); Younger v. Harris, 401 U.S. 37, 53-54, 91 S.Ct. 746, 754-755, 27 L.Ed.2d 669 (1971); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).[21] Abstention based upon considerations of federalism, see Moore v. Sims, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); Younger v. Harris, 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971), is also unwarranted, particularly in light of the fact that there are no pending state criminal proceedings. "[C]onsiderations of ... comity in our federal system ... have little force in the absence of a pending state proceeding," Lake Carriers Ass'n v. MacMullan, 406 U.S. 498, 509, 92 S.Ct. 1749, 1756, 32 L.Ed.2d 257 (1972); accord, Doran v. Salem Inn, Inc., 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); Steffel v. Thompson, 415 U.S. 452, 475, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974), particularly when balanced against "the high cost of abstention when the federal constitutional challenge concerns facial repugnance to the First Amendment." Procunier v. Martinez, 416 U.S. 396, 404, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). As Justice Rehnquist explains in Doran v. Salem Inn, Inc., supra:
The principle underlying Younger and Samuels [v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971)] is that state courts are fully competent to adjudicate constitutional claims, and therefore a federal court should, in all but the most exceptional circumstances, refuse to interfere with an on-going state criminal proceeding. In the absence of such a proceeding, however, as we recognized in Steffel, a plaintiff may challenge the constitutionality of the state statute in federal court, assuming he can satisfy the requirements for federal jurisdiction.
422 U.S. at 930, 95 S.Ct. at 2567.
The contest here, as I understand it, is a challenge to the statute as enacted, not as it may be enacted in the future. Looking at the statute as enacted, we ask the question: Is this something that goes beyond Miller and enters an area that the Supreme Court appears to have said is an impermissible area to enter; and further, if it does not, does it provide the procedural safeguards, the three-part test which incorporates contemporary community standards required by Miller?
As I view the statute it is overly broad. It is impermissibly broad. It is incurably broad. Ironically, if the intent of the legislature was to codify local "community standards," the statute has been drafted in such a way that the application of community standards is extinguished in the enforcement process  contrary to the mandate of Miller. To the extent that the state can appropriately regulate based upon contemporary community standards,[22] it should draft such opportunity into the statute if it's going to deal with the subject at all. In endeavoring to deal with the questions presented here, I think the appropriate thing to do would be to give those who are concerned, i.e., the legislature, an opportunity to rethink the matter and, if determined to go ahead, to redraft the matter.
It is no discourtesy to the constitutional competence of the state courts, cf. Moore v. Sims, 442 U.S. 415, 428, 99 S.Ct. 2371, 2379, 60 L.Ed.2d 994 (1979); Hearing Transcript at 4-5, to note that the federal courts are also charged with jurisdiction to hear and decide constitutional cases, and granted the power to decide them and to fashion the relief that is appropriate under all the circumstances. See 28 U.S.C. § 1331 *1000 (1976); U.S.Const., Art. III; J.I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946); Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). As the Supreme Court said recently in Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979):
At least in the absence of "a textually demonstrable commitment of [an] issue to a coordinate political department," Baker v. Carr, 369 U.S. 186, 217 [82 S.Ct. 691, 710, 7 L.Ed.2d 663] (1962), we presume that justiciable constitutional rights are to be enforced through the courts. And, unless such rights are to become merely precatory, the class of those litigants who allege that their constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights. "The very essence of civil liberty," wrote Mr. Chief Justice Marshall in Marbury v. Madison, 1 Cranch 137, 163 [2 L.Ed. 60] (1803), "certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." Traditionally, therefore, "it is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution and to restrain individual state officers from doing what the 14th Amendment forbids the State to do." Bell v. Hood, 327 U.S. [678] at 684, 66 S.Ct. 773, 777, 90 L.Ed. 939.
442 U.S. at 242, 99 S.Ct. at 2275 (emphasis added). The mere fact that "plain, speedy and efficient remedies" are available in the state courts does not deprive a federal district court of jurisdiction where a cause of action arises under the federal Constitution, or the federal laws and treaties. Georgia R.R. & Banking Co. v. Redwine, 342 U.S. 299, 306, 72 S.Ct. 321, 325, 96 L.Ed. 335 (1952); Alabama Pub. Service Comm'n. v. Southern R. Co., 341 U.S. 341, 361, 71 S.Ct. 762, 774, 95 L.Ed. 1002 (1951) (Frankfurter, J. concurring in result).
That abstention may be proper in an appropriate case does not translate into a general rule that state courts must be permitted the first opportunity to determine the constitutionality of a state statute. Enforcement of such a rule would "render impossible the performance of the duty with which the Federal courts are charged under the Constitution.... [T]he power of the Federal court to afford protection to a claim of right under the Constitution of the United States, as against the action of a state or its officers, would depend on the ultimate determination of the state courts, and would therefore require a stay of all action to await such determination." Home Telephone & Telegraph Co. v. City of Los Angeles, 227 U.S. 278, 284, 33 S.Ct. 312, 313, 57 L.Ed. 510 (1913). See also Examining Board of Engineers v. Flores de Otero, 426 U.S. 572, 597-598, 96 S.Ct. 2264, 2278-2279, 49 L.Ed.2d 65 (1976). Abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188-189, 79 S.Ct. 1060, 1062-1063, 3 L.Ed.2d 1163 (1959). It is not the rule. Colorado River Water Cons. Dist. v. United States, 424 U.S. 800, 813-814, 96 S.Ct. 1236, 1244-1245, 47 L.Ed.2d 483 (1976).
As Professor Laurence Tribe concludes, "[A] law whose reach into protected spheres is limited only by the background assurance that unconstitutional applications will eventually be set aside is a law that will deter too much that is in fact protected." American Constitutional Law 716 (1978). The statute in question here clearly reaches too far, and does so without being "fairly susceptible" to a sufficient limiting construction.
The statute, Utah Code Ann. § 76-10-1229(1) & (4), is unconstitutional on its face; the relief prayed for by the plaintiffs should be granted.
*1001 The whole question of "indecency" is an interesting one deserving of some final comments.
Merely calling something "indecent" doesn't necessarily make it so. At least under some definitions,[23] a high percentage of what we see on television, I think, could very well be brought under the umbrella of indecency. I think the appeal to violence is indecent. I think the appeal to the lowest level of the intellect is indecent. I think the appeal to instant gratification is indecent. I think appealing to the worst in all of us is indecent. Those who do ought to be ashamed of themselves. But that does not mean that what they do is proscribed.
We put up with it. What we do if we have occasion to be offended by something in a program is we get up and we turn if off. We do something else. We read a book. We refuse to purchase the sponsor's product. And if we're concerned parents and we're not overjoyed by the violence and stupidity of The Dukes of Hazzard, we turn it off and direct our children to something else.
That's one of the nice things about TV  not just cable TV, but also with the regular broadcast channels that are allocated, licensed and regulated by the government. There is no law that says you have to watch. There is no law that says that you have to purchase a television set. There is no law that says you have to subscribe to a cable TV service any more than you have to subscribe to The Salt Lake Tribune. One of the greatest virtues of our system, I think, is freedom to choose.
Even though many of us may not either approve or enjoy the forms of expression that occur along the borderline that has been drawn by the United States Supreme Court, we tolerate them. We tolerate them with the idea being that not everybody has the same tastes, the same likes or dislikes. The contemporary community standards to be applied in defining obscenity under the Miller formula "must be applied by juries in accordance with their own understanding of the tolerance of the average person in their community...." Smith v. United States, 431 U.S. 291, 305, 97 S.Ct. 1756, 1766, 52 L.Ed.2d 324 (1977) (emphasis added). "[T]he line between protected expression and punishable obscenity must be drawn at the limits of a community's tolerance," rather than in accordance with the more dangerously subjective standards of "propriety" and "taste", Red Bluff Drive-In, Inc. v. Vance, 648 F.2d 1020, 1029 (5th Cir. 1981)  or "decency", however defined.
To extend the reach of the criminal sanction beyond the sphere described in Miller v. California in hopes of effectively corralling individuals into making only "right", "proper" or "decent" choices runs counter to the settled constitutional rule that the States have no power to control the moral content of a person's thoughts. "To some, this may be a noble purpose, but it is wholly inconsistent with the philosophy of the First Amendment." Stanley v. Georgia, 394 U.S. 557, 566, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969). As the Supreme Court said in Kinglsey Int'l Pictures Corp. v. Regents, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959), "[t]his argument misconceives what it is that the Constitution protects. Its guarantee is not confined to the expression of ideas that are conventional or shared by a majority.... And in the realm of ideas it protects expression which is eloquent no less than that which is unconvincing." 360 U.S. at 688-689, 79 S.Ct. at 1365-1366. "Whatever the power of the state to control public dissemination of ideas inimical to the public morality, it cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts," Stanley v. Georgia, supra, or directing the making of the best choices.
Cable television's peculiar advantages derive directly from this matter of choice. *1002 The consumer is offered potentially limitless access to programming sources and content, whether entertaining, educational, religious, or otherwise interesting.[24] People deliberately subscribe to cable TV services in order to benefit from this expanded opportunity to choose.
Even the strictly licensed broadcast television industry is regulated with an emphasis on offering a diversity of programming for public selection and individual choice. Cf. Federal Communications Comm'n. v. WNCN Listeners' Guild, 450 U.S. 582, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981).
In his dissenting opinion in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), the late Justice William O. Douglas observed:
I have the same confidence in the ability of our people to reject noxious literature as I have in their capacity to sort out the true from the false in theology, economics, politics or any other field.
354 U.S. at 514, 77 S.Ct. at 1324. In the same vein, Justice John Paul Stevens recently commented that,
In the end, I believe we must rely on the capacity of the free marketplace of ideas to distinguish that which is useful or beautiful from that which is ugly or worthless. [Footnote omitted.]
Smith v. United States, 431 U.S. 291, 321, 97 S.Ct. 1756, 1774, 52 L.Ed.2d 324 (1977) (dissenting opinion). Notwithstanding the continued popularity of programs such as Laverne & Shirley, The Dukes of Hazzard and Flamingo Road, the same kind of confidence would seem to be warranted as to people's judgment regarding cable TV programming. In any case, within constitutional limits, an individual's choice to indulge in watching cable TV a lot, a little, or choosing not to indulge at all, should be his or her own. As the late Justice Louis Brandeis explained years ago,
The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feeling and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred as against the Government, the right to be let alone  the most comprehensive of rights and the right most valued by civilized men.... [emphasis added.]
Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (dissenting opinion).
In rethinking legislation on this subject, the members of the Legislature may indeed find that the provisions of the existing Utah pornography statute, Utah Code Ann. §§ 76-10-1201 et seq., are adequate to meet any problem that may arise. That statute explicitly follows Miller v. California in extending the criminal sanction to the constitutionally permissible limits, and does so as to all forms of expression, without special attention to any medium. They may find that the evenhandedness that results from something like that is a great virtue. They may also find that drafting a special statute dealing with cable TV amounts to a redundant duplication of what is already on the books.[25]
Finally, this Court finds that the defendant class as defined by the complaint is an appropriate class under Rule 23 of the Federal Rules of Civil Procedure, and that final certification should be granted.
This opinion shall constitute findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.
NOTES
[1] Utah Code Ann. § 76-10-1229 (Supp. 1981) reads as follows:

(1) No person, including a franchisee, shall knowingly distribute by wire or cable any pornographic or indecent material to its subscribers.
(2) For purposes of this section "material" means any visual display shown on a cable television system, whether or not accompanied by sound, or any sound recording played on a cable television system.
(3) For purposes of this section "pornographic material" is any material defined as pornographic in sections 76-10-1201 and 76-10-1203.
(4) For purposes of this section "indecent material" means any material described in section 76-10-1227.
(5) For purposes of this section "distribute" means to send, transmit, retransmit, or otherwise pass through a cable television system.
(6) Prosecution for violation of this section may be initiated at the instance of the attorney general or any county or city attorney of an interested political subdivision or at the instance of the governing body of any such political subdivision.
(7) Any person who violates this section is guilty of a class A misdemeanor.
[2] See Utah Code Ann. §§ 76-10-1201, -1203, & -1227 (1978, Supp. 1981).
[3] A class A misdemeanor is punishable by imprisonment for a term not exceeding one year and a fine not exceeding $1,000 for a person, $5,000 for a corporation. See Utah Code Ann. §§ 76-3-204, -301, & -302 (1978); see also id. § 76-3-303 (additional sanctions against corporate defendants).
[4] The First Amendment to the United States Constitution reads as follows:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances.
[5] "A law is void on its face if it `does not aim specifically at evils within the allowable area of [government] control, but ... sweeps within its ambit other activities that constitute an exercise' of protected expressive or associational rights. [Thornhill v. Alabama, 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940)]." L. Tribe, American Constitutional Law 710 (1978).
[6] Since no state criminal proceedings were pending against the plaintiffs at that time, abstention was inappropriate. See Doran v. Salem Inn, Inc., 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).
[7] Utah's pornography statute is codified at Utah Code Ann. §§ 76-10-1201 et seq. and is not at issue in this case. Compare Piepenberg v. Cutler, 507 F.Supp. 1105 (D.Utah 1980), aff'd 649 F.2d 783 (10th Cir. 1981).
[8] The First Amendment, of course, is made applicable to the States by the Due Process Clause of the Fourteenth Amendment. See Young v. American Mini Theatres, Inc., 427 U.S. 50, 52 n.1, 96 S.Ct. 2440, 2443 n.1, 49 L.Ed.2d 310 (1976), Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963); Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940); Stromberg v. California, 283 U.S. 359, 368, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931); Whitney v. California, 274 U.S. 357, 362, 371, 373, 47 S.Ct. 641, 643, 646, 647, 71 L.Ed. 1095 (1927); Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925).
[9] In the early years, the courts spoke of "whether the tendency of the matter charged ... is to deprave and corrupt those whose minds are open to such immoral influences ..." Regina v. Hicklin, L.R., 3 Q.B. 360, 371 (1868), a standard that permitted a judge to get out of the formula any value judgment that he chose to put in. E.g., Smith v. United States, 45 F. 476, 478 (D.C., E.D.Wis.1891) (re: the evils of "[i]mpure suggestion clothed in pleasing attire" vs. "bald filth"). In later years, the Supreme Court spoke of material which, "taken as a whole appeals to prurient interest." Roth v. United States, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957), or material "utterly without redeeming social value." Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). See Paris Adult Theatre I v. Slaton, 413 U.S. 49, 78-83, 93 S.Ct. 2628, 2644-2647, 37 L.Ed.2d 446 (1973) (Brennan, J., dissenting). Justice Potter Stewart was far more candid in his comment in Jacobellis v. Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964), that as to pornography, "I know it when I see it."
[10] In contrast, the late Justices Hugo Black and William O. Douglas gave the First Amendment a more absolute reading and would permit only very narrowly confined state regulation of free expression. See Miller v. California, 413 U.S. 15, 37-47, 93 S.Ct. 2607, 2622-2627, 37 L.Ed.2d 419 (1973) (Douglas, J. dissenting); United States v. Thirty-Seven Photographs, 402 U.S. 363, 379-388, 91 S.Ct. 1400, 1409-1420, 28 L.Ed.2d 822 (1971) (Black, J. joined by Douglas, J., dissenting); Ginzburg v. United States, 383 U.S. 463, 476, 482-492, 86 S.Ct. 942, 950, 969-974 (1966) (Black, J. and Douglas, J. dissenting); Jacobellis v. Ohio, 378 U.S. 184, 196, 84 S.Ct. 1676, 1682, 12 L.Ed.2d 793 (1964) (Black, J. joined by Douglas, J. concurring); Roth v. United States, 354 U.S. 476, 508-514, 77 S.Ct. 1304, 1321-1324, 1 L.Ed.2d 1498 (1957) (Douglas, J. joined by Black, J. dissenting).

More recently, Justice Stevens has expressed the view that criminal sanctions are inappropriate per se when applied to expression  even distribution of unprotected "obscene" materials. See Smith v. United States, 431 U.S. 291, 311-321, 97 S.Ct. 1756, 1769-1774, 52 L.Ed.2d 324 (1977) (Stevens, J. dissenting).
[11] Justices Douglas, Brennan, Stewart and Marshall dissented. This 5-4 split has prevailed since Miller, Justice Stevens joining the ranks of the dissenters in place of the late Justice Douglas. G. Gunther, Cases and Materials on Constitutional Law 1368-1369 & n. 2 (10th ed. 1980).
[12] Children, for example, are not to be included as part of the "community" for standard-setting purposes in obscenity cases. Pinkus v. United States, 436 U.S. 293, 297, 98 S.Ct. 1808, 1811, 56 L.Ed.2d 293 (1978) (federal statute).
[13] See Riggs, "Miller v. California Revisited: An Empirical Note," 1981 B.Y.U.L.Rev. 247 (1981).
[14] See Paris Adult Theatre I v. Slaton, 413 U.S. 49, 73-114, 93 S.Ct. 2628, 2642-2663, 37 L.Ed.2d 446 (1973) (Brennan, J. dissenting).
[15] In pertinent part, Utah Code Ann. § 76-10-1203 provides as follows:

(1) Any material or performance is pornographic if:
(a) The average person applying contemporary community standards, finds that, taken as a whole, it appeals to prurient interest in sex;
(b) It is patently offensive in the description or depiction of nudity, sexual conduct, sexual excitement, sado-masochistic abuse, or excretion; and,
(c) Taken as a whole it does not have serious literary, artistic, political or scientific value.
Insofar as § 76-10-1229(1) & (3) calls for verbatim application of the Utah pornography statute, it is not the subject of the plaintiffs' challenge. Pornography is simply not an issue in this case. See Hearing Transcript at 16.
[16] Section 76-10-1229(4) defines "indecent material" by reference to § 76-10-1227, which provides as follows:

For purposes of this act:
(1) "Description or depictions of illicit sex or sexual immorality" means:
(a) Human genitals in a state of sexual stimulation or arousal;
(b) Acts of human masturbation, sexual intercourse, or sodomy; or
(c) Fondling or other erotic touching of human genitals, pubic region, buttock, or female breast.
(2) "Nude or partially denuded figures" means:
(a) Less than completely and opaquely covered:
(i) Human genitals;
(ii) Pubic regions;
(iii) Buttock; and
(iv) Female breast below a point immediately above the top of the areola; and
(b) Human male genitals in a discernibly turgid state, even if completely and opaquely covered.
[17] The Attorney General apparently concedes this much. See Answer of Attorney General Wilkinson at ¶ 7.
[18] If applied to motion picture subject-matter, for example, & 76-10-1229 would encompass a number of Academy Award-winning films such as The Godfather, Being There, Coming Home, Annie Hall and Coal Miner's Daughter. See Supp. Response of HBO to def.'s Interrogatories, p. 2 (filed Sept. 16, 1981). These same motion pictures may be exhibited in theatres or on broadcast TV without running afoul of § 76-10-1229. The section makes criminal the presentation of material over cable technology that may freely be rented for home consumption through videotape or videodisc technology.

Even assuming arguendo that the state's policy presumptions behind the statute are valid, Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), what is the rational basis for discriminating against one technology?
[19] The state bears the burden of showing that there are no less restrictive alternatives to an overbroad statute. See Talley v. California, 362 U.S. 60, 66-67, 80 S.Ct. 536, 539-540, 4 L.Ed.2d 559 (1960) (Harlan, J. concurring); Thornhill v. Alabama, 310 U.S. 88, 98, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940); Note, "The First Amendment Overbreadth Doctrine," 83 Harv.L. Rev. 884, 917-918 (1970).
[20] There are, of course, no pending state criminal proceedings against the plaintiffs as a result of the preliminary relief granted by this Court. See Doran v. Salem Inn, Inc., 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).
[21] There is nothing in Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) to the contrary. In that case, abstention was held improper as to clear statutory language and proper as to vague language whose meaning was as yet unresolved by the Arizona state courts. 442 U.S. at 305-312, 99 S.Ct. at 2312-2316.
[22] The Utah Supreme Court has defined the standard-setting "community" within the meaning of the general pornography statute as being the county from which the jury is drawn. State v. Pierren, 583 P.2d 69, 71 (Utah 1978); State v. International Amusements, 565 P.2d 1112 (Utah 1977).
[23] See e.g., Smith v. United States, 431 U.S. 291, 319 n.20, 97 S.Ct. 1756, 1773 n.20, 52 L.Ed.2d 324 (1977) (Stevens, J. dissenting); Regina v. Close, [1948] Vict.L.R. 445, 463 (Judgment of Fullagar, J.), quoted in Manual Enterprises v. Day, 370 U.S. 478, 482-485, 82 S.Ct. 1432, 1434-1436, 8 L.Ed.2d 639 (1962); Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948); Webster's New International Dictionary 679 (2d ed. 1954).
[24] See e.g., National Cable Television Ass'n, A Cable Primer 6-9, 27-29 (1981).
[25] While the Supreme Court is justifiably reticent in Moore v. Sims, 442 U.S. 415, 428, 99 S.Ct. 2371, 2379, 60 L.Ed.2d 994 (1979), about "the cost to our federal system of government inherent in federal court interpretation and subsequent invalidation of parts of an integrated [state] statutory framework," that cost is mitigated here by the fact that the truly integrated statutory framework, viz., the Utah pornography statute, remains fully in force.